To the second case, Karma International v. Indianapolis Motor Speedway. Mr. Datto? Yes. Good morning. My name is Brett Datto. I represent Karma International, the appellant in this case. I'd like to reserve five minutes. If you would raise your voice, that would help. That microphone records better than it amplifies, and this is a big room. Sure. Thank you, Your Honor. I represent Karma International, the appellant in this case. I'd like to reserve five minutes for rebuttal. As the Court is aware, and I won't get into extensive recitation of the facts, my client organizes and hosts events, and in 2016 was the exclusive licensee for the Maxim brand. And pursuant to that license, it contacted and engaged in a relationship with the International Motor Speedway to host a party in May of 2016 around the 100th anniversary of the Indianapolis 500 race. My client, Karma, secured the venue for that event, it hired the talent for the event, it hosted the party, and it expected revenues of at least $635,000 in doing so. When Karma filed the complaint in this action, which rises to the errors that we are here today to discuss, it set forth in the complaint the terms of a trade agreement between the parties. And I think the district court, when it improperly granted summary judgment, relied solely upon that trade agreement as the entirety of the contract and the contractual relationship between the parties. And what happened was that the district court disregarded other allegations in the complaint that talked about other obligations of the parties, such as oral representations and promises that were made by the Indianapolis Motor Speedway to Karma, upon which Karma relied to its detriment in this particular case. So when granting summary judgment, the trial court, the district court, improperly ruled as a matter of law that there were certain judicial admissions made by my client, Karma, in the complaint and it disregarded any evidence of oral promises and representations of the International Motor Speedway, which formed, in part, the basis upon which the complaint was... Counsel, what evidence of record shows that any additional e-mails from the Motor Speedway would have sold more tickets? Mr. Marr's testimony, he is the principal of the Karma International... He testified that he believed that, but what evidence shows that the belief is correct? Just based upon his history in the industry, Your Honor, he has worked with other similar... There must be people who can testify to the relation between blast e-mails and sales. Yes, we intended to prove that through two sources, Your Honor. But so far as I can tell, there's no such evidence in this record, and that's a problem, at least for me. We intended at time of trial, Your Honor, to prove that through two sources. One was Mr. Marr, and one was the International Motor Speedway, who has a history of utilizing their e-mail database to promote their events. And based upon their promises and representations to Mr. Marr, that through their marketing efforts, they're always able to sell out their events, we didn't think it was necessary to have an independent marketing expert to give an opinion on that issue. Your Honor, with respect to the issue, however, I think it was improper for the district court to first rule as a matter of law that there was a judicial admission in the pleadings that the trade agreement solely represented the agreements between the parties. Had the district court allowed the liberality under Rule 15-8 and the case law 15-A and the case law in the Seventh Circuit to amend the pleadings to allow the evidence to conform to what has come out in discovery, then the district court would have been presented with a situation where it would have had to consider the disputed issues of fact and then would have said that the grant of summary judgment was improper and would have allowed the case to go to trial in the merits. How would that have affected the damages ruling, though? Well, that goes to his Honor's question as well. It would have been up to the jury then to determine whether or not, based upon the representations by the International Motor Speedway, that $500 per ticket was a fair price, that 1,500 tickets was a fair allocation of the tickets that would be sold, and based upon the evidence that CARMA had as far as what its expenses were, it would have been up to the jury to make that determination. The judge's rationale is that that testimonial evidence about, oh, we always sell out, et cetera, that was speculative as a measure of damages, and what's wrong with that reasoning? I think what's wrong with that reasoning, and I don't think they necessarily utilized the word speculative. I think the word was that they said that the evidence wasn't such that it was a guarantee, but rather that it was a promise, and our contention is that a promise is a contract, and therefore that was enough for the trial court to say that the issue should be decided by the jury. But I understand. But you still have to prove a link between the failure to send the email and the lackluster ticket sales, and that's what's missing here, and you can't fill that gap with this sort of puffing testimony from the speedway folks. And the judge did say that's just speculation. It's not evidence. The court did go on to say speculation, but it also said that by saying that we will sell this event out, we will sell 1,500 tickets, and 500 per ticket is not an unreasonable price, I think the court was saying that that wasn't a guarantee that the event would be, in fact, sold out at 1,500 tickets. To answer Your Honor's question, there were two ways that we intended to do this. One is through the testimony of Mr. Marr, who's been in the industry for nearly 30 years, who had hosted the 2016 NFL Super Bowl party, and who knows how these events are marketed and how there's a schedule in place to effectively sell to your clientele. That's number one. Number two, in discovery, we asked representatives of the International Motor Speedway, based upon their sending of emails out to their customer base, their suite holders, their clientele, and those that attend the events, how is the event ticket sales related to that? Correlation is not causation. And the fact that in the past, an email involving a completely different event at a completely different time produced a sellout, whereas this one didn't, that's not enough to establish causation. Absent some sort of damages expert, it seems to me, and lay testimony that, well, we've always sold out in the past, isn't going to cut it. And I think therein lies the issue, because then you're going to have a damages expert who is also going to be relying upon speculation, because the damages expert is going to have to analyze the specific market in the industry in order to make that determination. Right, and that's reliable evidence in a court of law, just an assertion that, well, these events generally sell out is not a reliable proof of a causal connection between the failure to send the email and the level of damages that you're claiming. Yeah, I disagree, Your Honor, for this reason, that in this particular instance, first of all, you had the district court finding as a matter of fact and as a matter of law that the International Motor Speedway entered into a contractual relationship and breached that contractual relationship because they didn't send the dedicated email to their entire database. What's the effect of the jury trial evidence and verdict on that summary judgment ruling? Meaning the International Motor Speedway? Is it still valid? Meaning the International Motor Speedway's counterclaim against Karma? Right. I mean, that issue was conclusively resolved against you by the jury, so the judge's summary judgment ruling on the breach question just evaporates, because that was embedded in the counterclaim. It was embedded in the counterclaim, but I think the problem for the International Motor Speedway as to that particular issue is that at trial on the counterclaim, they provided no evidence whatsoever that they reasonably expected to be damaged as a result of the failure to place the banner ad on maxim.com. That became the sole issue at time of trial. But they had to prove their own performance. Correct. Right, in order to recover. And there's a jury found against you on that. So the proofs at trial were different than what was in the record at summary judgment, or at least the jury evaluated them differently than the judge did in ruling on summary judgment. So I think that summary judgment ruling about breach is just gone. Well, it's gone to the extent that you, as the reviewers in this particular instance, say that Karma had the opportunity at time of summary judgment to argue the oral representations and the reliance upon the oral representations because then that issue then becomes summary judgments denied and then you go to trial on all issues. But I agree with you that that's not procedurally how it happened in this particular instance. With that being said, I think the district court just improperly took a look at the complaint and solely relied upon the trade agreement as the only memorialization of what the parties intended in this particular case. And nowhere in the complaint was that stated. In fact, the term trade agreement was not a defined term. The trade agreement was attached to the complaint, but the defined term in the complaint was Agreement, capital A, not the trade agreement, capital T, capital A,  and that there were these other promises and representations. So at time of summary judgment, it was our position that even though we lost on the motion earlier for leave to amend the complaint to bring in these additional quasi-contractual remedies, at time of summary judgment when the court was ruling upon the merits of the issues, it should have taken a look at those oral representations and promises and defeated summary judgment and allowed the case to go to trial on that particular issue. Understanding the damages issue would be another issue to decide at time of trial. I'll reserve my time at this time, Your Honor. Thank you, sir. Ms. Grijalva? Good morning, Your Honors. I may please the court. I'm Angela Kruhulik representing the Indianapolis Motor Speedway. When IMS and Karma International got together and agreed to work together to co-market the Maxim Indy 500 party in 2016, IMS hoped it would succeed and did everything it could to help that party succeed. However, IMS never took on any obligation or responsibility for the execution of that party and let alone the success of that party. There was some talk just a few minutes ago about how a damages expert may have been useful to Karma International in its case, and I would posit to the court that, in fact, simply obtaining a concrete obligation from IMS, which they have testified they would never have done, to sell a certain number of tickets or related to the success of the event would give Karma International what it seeks here, but there is no evidence that that ever occurred. There is speculation and that's all we're left here. We had a trial. The result of that trial was a judgment in favor of IMS, and while it was for a lesser amount, a much lesser amount than IMS requested from the jury and a lesser amount than IMS's damages expert told the jury it should be awarded, that judgment was based on evidence. It was based on testimony from multiple witnesses, and it's fully supported by the record. Karma is asking the court to take a look at several things here. The first is the court's grant of summary judgment, which Your Honor has already addressed. Karma did not prove that it had any ascertainable damages, and that was the sole basis for the court's ruling on summary judgment. There was no evidence, no expert, that any actions by the Indianapolis Motor Speedway actually caused the damages that Karma claimed. In fact, Karma claimed that the event would have been a total sellout and that it would have received a gross profit and wanted IMS to provide compensation for that entire gross profit without regard to the expenses involved in putting on the event.  And IMS certainly would not be responsible for the gross profit of an event, let alone any profit from the event where it made no guarantees as to its success. How many of these private parties are typical at an Indy 500 weekend? They aren't terribly typical. There are a few regular events. There's a snake pit ball that happens every year, and IMS is involved in some other events. This was an unusual situation. I don't believe IMS had ever licensed its intellectual property to a third party to put on one of these types of events. In 2016, because of the scope of the race that year, and in fact that was the first year that there was ever a total sellout for the race venue, in 2016 I believe there were two events that IMS actually licensed its intellectual property to because they wanted to capitalize on this monumentous occasion and get the benefit. What was so special about 2016? It was the 100th running of the race. Not the 100th year, it was the 100th running because there were several years where the race didn't occur due to war or other circumstances. So it was the 100th running of the race, which was a big deal. It was really cool to see the posters on the door sold out. So CARMA's damages aren't related to IMS's deliverables. A simple look at the trade agreement shows there was no mention of a number of tickets, there was no mention of a number of attendees, there was no mention of any nexus between the email to be sent and what it would produce. IMS simply agreed to send it and it did so. As to CARMA's arguments related to the judicial admission that the court found, CARMA has said that the summary judgment ruling by the district court should be overturned because the court's finding that CARMA judicially admitted that the trade agreement was the party's entire agreement was incorrect. However, CARMA sought to amend its complaint in this case. It sought to amend its complaint after discovery closed and it was some, I believe, seven months after the deadline in the case management plan for such an amendment. And the district court denied the motion to amend the complaint. That was an order of the magistrate judge. CARMA failed then to appeal or object to that ruling to the Article III judge and in doing so, CARMA waived any right it had to appeal the denial to amend the complaint. And I think we've cited the U.S. v. Hernandez-Rivas case from this court from 2003 in our brief on that point. So CARMA is bound by its pleadings. The court found that it was. It's also bound by the statements it made therein. It was not only in the complaint that it alleged the trade agreement was the party's sole agreement. It was also in the answer to IMS's counterclaim because IMS, in fact, alleged that the trade agreement did not memorialize the entirety of what the parties discussed. It wasn't signed. But CARMA denied that in answering the complaint and specifically stated that the trade agreement was the party's entire agreement. CARMA also alleges in this appeal that the district court committed an error by not conforming the pleadings to the evidence in this case. And there's never been a motion made. The allegation is that the district court should have, on its own, sua sponte, conformed the pleadings to the evidence presented and basically revived the claims that it wasn't allowed to assert in the denied amended complaint. The cases that are cited on this proposition in the brief simply do not support it in CARMA's briefing. All of those cases had to do with instances where the amendment of the claims would not prejudice the other party. And here the court found clearly that amendment would prejudice the Indianapolis Motor Speedway because all of the discovery had been completed in reliance on the claims as asserted in the complaint. And finally, the district court, after trial, correctly entered judgment to IMS on its counterclaim. CARMA simply ignores all of the testimony from the Indianapolis Motor Speedway witnesses at trial about the damages contemplated at the time of entering into this agreement that were later specifically quantified by the expert witness, the marketing expert witness who, by the way, CARMA agreed was qualified in that area to testify at trial. The district court, in fact, said there was ample evidence at trial from which the jury reasonably could conclude that the damages were reasonably foreseeable by the parties. IMS's executive director of events testified about the value of CARMA's deliverables to IMS, the banner ad having value not only in relation to this event but beyond because of the intended audience. It was a demographic group that IMS wants to draw in and have as continued fans for its events. He made similar comments at trial about the social media posts having value to IMS and the expectation that those would produce positive fan engagement for the Indianapolis Motor Speedway. And so the harm to IMS, of course, was then the failure to receive the promised exposure and the lost opportunity associated with the 100th running event being such a special time. In addition, IMS gave up many of its own assets to CARMA International in the form of suite space, credentials, tickets. So IMS also anticipated that if performance was lacking, the loss of those assets would be detrimental as well. Finally, the district court correctly denied CARMA's request for a new trial. That finding is an abuse of discretion standard of review. The jury found that IMS complied not only with its contractual obligations and that that was supported by the evidence. IMS went above and beyond. I've already talked about that. Not just one email, as was required by the trade agreement, but three dedicated or stand-alone emails for this event and one email that included this event and some of its others. And there was significant and sufficient evidence that CARMA failed to comply with its own obligations, and that's what the jury based its verdict on. Both Jared Krisloff, who I spoke of earlier, who's the executive director of events or was at that time at the Indianapolis Motor Speedway, and Ryan Hollander of the Indianapolis Speedway testified that there was no banner ad ever placed by MAXIM and that there were no social media posts, and they had done research to confirm the truth of those statements, and they talked about that at trial. The only testimony on this point from CARMA International was that of its CEO, Dylan Maher, who said he didn't know whether those deliverables had ever been actually placed and that he introduced IMS to executives or team members at MAXIM and anticipated that they would then take it from there to make sure CARMA International complied with its obligations under the trade agreement. But as the district court said in its ruling denying the request for a new trial, simply making an introduction isn't fulfilling your contractual obligations. There was more required of CARMA, and the jury found that CARMA did not fulfill those obligations. I guess, in summary, IMS was acting in a karmic way here. It was seeking to give as good as it got, and it wanted some reciprocation. I think the court's rulings and the judgment of the jury should stand, and thank you for your time. All right. Thank you, Ms. Krahulik. Ms. Krahulik? Mr. Donovan? Briefly in rebuttal, the International Motor Speedway wants to completely ignore the district court's finding in summary judgment. District judges don't make findings on summary judgment. The trial court's finding on summary judgment. Judges don't make findings on summary judgment. They enter legal conclusions about what the evidence can show and what a reasonable jury could find. You're correct. I misspoke. The district court's ruling in summary judgment that it breached the contract, and the exact wording in the district court's summary judgment opinion was that, quote, there is no question that IMS did not send an email to its entire database, end quote. And the reason that I wanted to start with that on rebuttal is because IMS, in their arguments before the court here this morning, completely disregards that ruling from the district court. Moreover, what's important as it relates to that particular issue is that IMS wants to also ignore the fact that the complaint fled issues in the complaint as it relates to what the promises that IMS would do with respect to sending and promoting this event to their entire email database. And while IMS wants to take the position that they sent three emails to promote this event, the fact remains that they never sent an email to their entire database as they were contractually obligated to do. That then delves into the issue of the damages that I know the court is having an issue with in this particular case. Well, actually, before it gets into that, it runs into the teeth of the jury's verdict. Well, the jury's verdict had to do with the IMS value of their intellectual property. But the jury had to conclude that the Speedway performed its end of the bargain. As it relates to that particular issue in the counterclaim, that it provided the deliverables and that those deliverables had a value. Correct. But not as it relates to any other issues because I was precluded at time of trial from getting into the merits of that issue because of the grant to summary judgment. So I had to sort of dance around that issue at time of trial, recognizing that I didn't want to be accused of violating the court's directive on summary judgment that I was precluded from offering evidence on those additional issues. Mr. Dotto. Yes, Your Honor. If I could ask you, looking at the trade agreement. Yes, sir. It has a fair amount of specifics for both parties. If there was a commitment to use the entire database of IMS, why was that not included in that? It is, Your Honor. It is. I don't have it in front of me, Your Honor. It's down at the bottom. It says entire database, one dedicated. It uses the word entire. I'll have to look at it again. I didn't see entire there. It is in there, Your Honor. It is in there. It says entire database in the trade agreement. The part that says one dedicated email? I wish I brought the trade agreement. That's all right. Do you see the part that says dedicated email? No, I don't. Perhaps I don't have a complete. It's the fourth bullet point. Thank you, counsel, for IMS. The fourth bullet point under the first deliverable, marking support via IMS social channels and one dedicated email to IMS database. It does not use the word entire. It says IMS database. It just says database, right? It does. And, Your Honor, in discovery, we asked whether their entire database was what they represented it to be because we had to start breaking it down. And they ultimately concluded and conceded that their entire database was over 700,000. 700,000. That's right. No, no. So that was the entire database. That's right. Right. And they did give you partial. That's right. I mean, they gave you whatever the number is. So is your argument that that agreement does say entire database as opposed to, even though it doesn't have the word entire? The parties did, with all due respect to IMS, who may disagree on this, I think at time of discovery, everybody agreed that database meant the entire database. And I believe there may have been a request for admission on that particular issue with respect to whether the entirety of the database represented who they claimed to have sent the emails to. And it ultimately became that it was the 700,000. Your Honor, where I wanted to conclude was that I heard counsel for IMS say that at time of summary judgment, the district court made a ruling that it would have been prejudiced had the evidence conformed to what came out in discovery. And that is absolutely improper. And the reason that it's improper is because there was extensive discovery prior to summary judgment as it relates to all of these issues of oral representations and promises. And I'd ask the court, when it makes its ruling in this particular case, to take a look at paragraphs 16 and 17 of our complaint. Paragraphs 16 and 17 of our complaint in this particular case say, quote, IMS made representations and assurances that 1,500 tickets would be sold at $500 per ticket. And paragraph 17 of the complaint says that based upon the representations and contractual obligations made by IMS, that CARMA expected a million dollars in gross revenues. So to say that it would have been prejudiced at time of summary judgment by having to defend against new theories, new causes of actions, is absolutely improper in light of the fact that from jump in the complaint, it was alleged that there were these assurances and representations. The last thing that I wanted to talk about is obviously the issue of damages. I think both your honors have an issue with respect to whether or not our position of utilizing Mr. Marler as our representative to testify as to the issue of damages and utilizing the testimony of IMS would have been sufficient. I cite to what's in our brief in some Seventh Circuit case law that says that federal courts routinely permit the owner and officer of a business to testify as to damages without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. And in this particular case, based upon what Mr. Marler knows in the industry about how these emails are sent and how they're marketed and how the events are sold ticket-wise, and based upon IMS's own testimony in terms of what we learned in discovery, we believe that it would have been right for the jury to make that determination based upon solely Mr. Marler and the testimony of IMS without the necessity of an accountant. The question that you're referring to is that business owners can testify to their own sales. But what you're asking for is for the Speedway's principal or one of the principals for Speedway to testify about Karma's sales? No, two things I'm saying. And what Karma would have sold? No, Your Honor. And I apologize if I misled the court. What I was saying is twofold. Mr. Marler has been in the marketing industry of doing these parties for nearly 30 years. He knows the market as far as how an event is marketed via social media, via the channels that IMS was to deliver in this particular instance, and the return on those social media efforts to sell tickets. To a third-party vendor? To a third-party vendor, yes. Even though he's not affiliated with a third-party vendor? He deals with the third-party vendors every day. The second way that we intended to do this was through IMS's own testimony that we learned through discovery and through the ways in which they market their events. I think it's important. It's actually even in IMS's own brief to Your Honors in this particular case when they cite the press release that the IMS president, Doug Bowles, made prior to this event. And he said, quote, The Maxim Party will be an epic VIP experience, blending sports, entertainment, and culture, and bringing even more thrills to an action-packed race week. The press release went on to say that we are inspired by fashion, art, music, and racing with 2,000-plus attendees that will be attending this particular event. So even IMS's own president felt as though 2,000 people would be attending this Maxim Party. So when they promised, they, IMS, promised, karma, that 1,500 tickets would be sold, and we relied upon that, even their own president had a projection more than that. So we had the ability through those representations, those admissions, to prove our case on damages. Thank you. Thank you. Thank you, Mr. Powell. Thank you, Ms. Krugel. Case is taken under advisement.